**ARDIZONNE et al. v. ARCHER et al.**

No. 8102—Opinion Filed Jan. 7, 1919.

Petition for Rehearing Dismissed Feb. 11, 1919.

(178 Pac. 263.)

(Syllabus.)

1. **Oil and Gas—Lease—"Found in Paying Quantities."**

The phrase "oil or gas is found in paying quantities," as used in the covenant of an oil and gas lease, that "it is agreed that one well on this lease is to be drilled to the top of the Mississippi lime, unless oil or gas is found in paying quantities before that lime is reached, unavoidable accidents excepted," taken in connection with other provisions of the contract, is interpreted to mean finding

oil or gas in such quantities as would justify the expectation of a reasonable profit above the entire cost, including the cost of drilling and equipping the wells.

## 2. Same—Breach of Express Covenant — Damages.

The measure of damages for the breach of an express covenant in an oil and gas lease, to drill one well to the top of the Mississippi lime, is held, under the facts and circumstances of this case, to be the reasonable cost of drilling same.

Error from Superior Court, Tulsa County; M. A. Breckinridge, Judge.

Action by Thomas Jay Archer, an infant, by John W. Archer, his guardian, against Joseph Ardizonne, F. J. Ossenbeck, and others. Judgment for plaintiff against the named defendants and in favor of the other defendants, and the named defendants bring error. Affirmed on condition of a remittur, and otherwise reversed and remanded for a new trial.

Philip Kates, for plaintiffs in error.

H. B. Martin, A. F. Moss, and R. A. Reynolds, for defendants in error.

MILEY, J. This action was commenced in the court below by defendant in error, Thomas Jay Archer, an infant, by his guardian, to recover from plaintiffs in error, Joseph Ardizonne and F. J. Ossenbeck, and the defendants in error W. F. Braun and W. W. Lantz, damages for alleged failure to comply with the covenant in an oil and gas mining lease to drill one well "to the top of the Mississippi lime." After issues of fact joined, there was trial to the court, a jury being waived, which resulted in decision and judgment in favor of the infant and against the plaintiffs in error for $2,500, and in favor of the defendants in error Braun and Lantz, to reverse which this proceeding in error is prosecuted.

It appears from the record before us that the guardian of the infant, pursuant to proper orders of the county court having jurisdiction, executed to W. F. Braun an oil and gas mining lease on a then untested and unexplored tract of 80 acres of land belonging to the infant for the term of his minority and as much longer thereafter as oil or gas should be found in paying quantities. The consideration to the lessor being $10 paid, and, among others, one-eighth of all the oil produced and $175 per year for each gas well where gas only was found and used off the premises. The lease contained the following express covenants with reference to development:

"The party of the second part (lessee) agrees to commence a well on said premises within thirty days from the date hereof, or pay at the rate of $100.00 in advance for each additional month such commencement is delayed from the time above mentioned for the commencement of such well until a well is commenced; and it is agreed that the commencement of such well shall be and operate as a full liquidation of all rent under this provision during the remainder of the term of this lease.

"It is agreed that one well on this lease is to be drilled to the top of the Mississippi lime unless oil or gas is found in paying quantities before that lime is reached, unavoidable accidents excepted."

The rights and obligations of the lessee Braun passed by mesne assignments to plaintiffs in error. A well was not drilled to the Mississippi lime, but one was drilled to a less depth, at which an oil-bearing strata was found. This well was shot, equipped, and operated for about eight months. At the expiration of that time the oil was so far exhausted that the quantity being then produced was insufficient to pay the costs of further operating the well, and it was plugged and abandoned. This well was not deepened to the Mississippi lime, and there has been no further development of the premises. The cost of drilling and equipping the well was $3,784. During the eight months it was operated, oil was produced of the gross value of $452.85, of which the lessor received one eighth or $56.60, leaving to the lessee $396.25. The cost of operating the well was $258.05, so that the lessee realized from the oil produced during the eight months, over and above the expenses incurred in operating the well after the same had been drilled and equipped, the sum of only $138.20. The trial court concluded that oil or gas had not been found in paying quantities at a less depth and that the covenant to drill to the top of the Mississippi lime unless it was so found had been breached by plaintiffs in error, for which they were liable in damages. The court further found the cost of drilling a well to that depth to be $2,500, which was adopted as the measure of damages.

The first question presented by plaintiffs in error for consideration by this court is stated by them as follows:

"Are the lessees, or rather the assignees, liable for failure to prosecute the drilling of the lease and to drill a well to the Mississippi lime"?

Upon this question they do not contend that they were prevented from drilling to the stipulated depth by unavoidable accident.

The contract contained the surrender clause, yet plaintiffs in error did not undertake to terminate their liability according to the terms of that provision, and they make no contention that they were not bound by reason or such clause in the contract. They simply contend that the evidence shows conclusively that oil was found in paying quantities before the Mississippi lime was reached, which, if true, would be a compliance with the agreement, and they would not, of course, be liable for any damages.

Whether there has been a compliance with, or breach of, the express covenants of an oil and gas lease with reference to development when the object of the operation is to obtain a benefit or profit for both lessor and lessee, is ordinarily a question of fact to be determined by the court or jury in each particular case from all the facts and circumstances in evidence. The judgment of the lessee although exercised in good faith, is not conclusive of the question. Paraffine Oil Co. v. Cruce, 63 Okla. 95, 162 Pac. 716; Brewster v. Lanyon Zinc Co., 77 C. C. A. 213, 140 Fed. 891. In this case, there is no conflict in the evidence. The only difference between the parties is as to the meaning of the phrase "found in paying quantities," as used in the clause of the contract obligating the lessee to drill one well to the top of the Mississippi lime unless oil or gas is found in paying quantities before that lime is reached. The interpretation of that clause in the contract is, under the circumstances of this case, a question of law for the court. American Jobbing Ass'n v. James, 24 Okla. 460, 103 Pac. 670; J. Rosenbaum Grain Co. v. Higgins, 40 Okla. 181, 136 Pac. 1073.

Plaintiffs in error contend that "oil or gas in paying quantities" means such quantity as can be produced at a profit, even a small one, over the operating expenses, though the cost of drilling may never be repaid and the operation as a whole may result in loss. Numerous authorities are cited in support of that interpretation. but all these authorities interpret the phrase as used in the clause fixing the term of the lease, and it may be said that such has come to be the generally accepted definition when used in that connection. When the lessor has agreed that the lessee may hold the premises as long after a fixed term as oil or gas is produced in paying quantities, such interpretation seems to be reasonable and just and may be said to have been that intended by the parties. But because a word or phrase is interpreted as having a given meaning in one clause of a contract, it does not necessarily

follow that it has the same meaning in some other clause or when used in some other connection. Even the clear and explicit language of a contract does not necessarily govern its interpretation if such involves an absurdity. Section 948, Rev. Laws 1910. To adopt the definition above mentioned as the fixed legal meaning of the phrase wherever used in oil and gas leases would, in some instances, lead to an unreasonable and absurd result, which is never presumed to be intended or contemplated by the parties. For illustration: Some leases contain an express provision to the effect that if, as a result of sinking a test well, oil is found in paying quantities, the lessee shall within a certain time drill a given number of additional wells. It would seem preposterous, to hold that under such provision the lessee was obligated to put down the additional wells if the test well produced no more oil than did the one drilled on these premises. In interpreting the term "found in paying quantities," as used in that connection, the cost of drilling and equipping the well should be taken into consideration. It has been held that unless oil is found in such quantity as would, taken in connection with other conditions, induce ordinarily prudent persons engaged in like business to expect a reasonable profit on the full sum required to be expended in the prosecution of the enterprise, the lessee would not be obligated to put down the additional wells. Manhattan Oil Co. v. Carrell, 164 Ind. 526, 73 N. E. 1084. Thus it would seem that the phrase may be interpreted to include or exclude the cost of drilling and equipping wells, according to the connection in which it is used. Therefore like many other words and phrases it cannot be said to have a settled legal meaning.

Such being the case, the phrase must be in each case so interpreted as to give effect to the mutual intention of the parties as existed at the time of contracting so far as the same is ascertainable and lawful. Section 946, Rev. Laws 1910.

While, under the provisions of the contract, the lessee was not absolutely obligated to drill on the premises at all, as he might have paid the lessor the stipulated sum per month and delayed or avoided altogether the development of the premises, yet, when drilling was commenced, no rental was required to be paid thereafter by the lessee to the lessor, and whether the lessor received any further benefit from the contract would depend upon whether oil or gas was produced, the amount received by the lessee depending upon the quantity, and that, in a measure, dependi⸱ ⸱⸱

on the number of wells. At the time the contract was made the land had not been explored for oil and gas, and so far as appears from the evidence was otherwise of unproven value therefor. The lessee was expressly obligated to drill only one well. The drilling of this one well was an operation to obtain a benefit or profit for the lessor as well as the lessee, and upon the quantity of oil or gas discovered thereby would depend, not only whether that one well could be operated profitably, but also whether additional wells should be drilled with the reasonable expectation of a profit to both the lessor and the lessee. We think therefore that, when the lessee obligated himself to drill one well to the top of the Mississippi lime unless oil or gas was found in paying quantities before that lime was reached, the parties mutually intended at the time such quantities as would justify not only the operation of that well by the lessee, but also in such quantities as would indicate that further development could be conducted with the expectation of a reasonable profit on the entire cost thereof. It is very plain from the evidence that oil was not found by the lessee in such quantity, and that the trial court did not err in the conclusion that the covenant had been breached.

The plaintiffs in error contend that when the well that was drilled ceased to produce oil in sufficient quantities to pay the cost of operating it, and they plugged and abandoned the same, the lease was then terminated and they had no right to hold the premises for further development or exploration. The term of the lease was "during the minority of said ward, and as much longer thereafter as oil or gas is found in paying quantities." It is argued that the phrase "found in paying quantities" is a limitation on the term "during the minority of the ward." We do not think so. If the clause had read "during the minority of said ward and oil or gas is found in paying quantities," there might be merit in the contention and the authorities cited would be in point; but it is quite clear that the right of the lessee to hold the premises "during the minority of 'said ward" was not dependent on "finding oil or gas in paying quantities," but that that phrase, instead of limiting the right to hold during a fixed term, was a provision extending the term beyond the minority of the ward. We do not mean to say that the lessee, after abandoning the well as unproductive, or even if he had drilled a well to the Mississippi lime without finding oil or gas, could thereafter hold the premises during the remainder

of the term of the minority of the ward against the will of the lessor without further effort to find oil or gas, but only say that by drilling a dry hole, or abandonment of an unprofitable well, the contract did not ipso facto terminate, and the lessee had the right thereafter, and during the term of the minority of the ward, to further test and explore the premises, and that he had at least a reasonable time in which to resume operations and begin such further development.

The plaintiffs in error being expressly obligated then to drill one well on the lessor's premises to the Mississippi lime, and having failed to do so, what is the measure of damages? By statute in this state it is provided, section 2852, Rev. Laws 1910:

"For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this chapter, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which in the ordinary course of things, would be likely to result therefrom. No damages can be recovered for a breach of contract, which are not clearly ascertainable in both their nature and origin."

Can it be said that, inasmuch as the lessor has not drilled the well, he has suffered no detriment, and therefore he is only entitled to recover nominal damages? We do not think so. It might as well be argued that if A. contracts to build a house for B., and is paid for it and then fails to keep his agreement, B. can only recover nominal damages unless he, himself, has built the house A. was paid to build. In this case, the lessor granted to the lessee certain rights and privileges appertaining to his property, in consideration of which the lessee agreed, among other things, to drill the well in question. No one would question the right of B. to recover of A. the cost of building the house, and we see no reason why the plaintiffs in error may not properly be required to pay the lessor the cost of drilling the well. We are not impressed with the argument that the lessor has suffered no detriment because it is not shown that, if the well had been drilled, oil or gas would have been discovered. The very purpose of drilling the test well was to ascertain whether oil or gas could be found. It does not lie with the plaintiffs in error, who engaged and were compensated for drilling the well, to say that their performance would not be beneficial to the lessor. It has been held that loss may be sustained in a legal sense for the breach of a contract, not-

withstanding it can be shown that the performance would have been a positive injury, as in case of a failure to erect a useless structure upon another's premises. Chamberlain v. Parker, 45 N. Y. 569. The views herein expressed are supported by the following authorities: Lawton v. Fitchburg R. Co., 8 Cush. (Mass.) 230, 54 Am. Dec. 753; St. L. J. & C. R. R. Co. v. Lurton, 72 Ill. 118; L. C. & S. W R. R. Co. v. Wray, 52 Ind. 578; Taylor v. N. P. C. R. R. Co., 56 Cal. 317; Chamberlain v. Parker, supra.

In the case last cited, the court refused to apply the principles therein enunciated for the breach of the contract to drill an oil well, not for the reason that it did not appear that oil would be found as a result of sinking the well, or that the lessor had not himself drilled the well, but because in that case it appeared that drilling the well could not possibly result in a benefit to the lessor since the whole production of the well, if oil should be found, would belong to the lessee for all time, and that the loss or gain in sinking the well would be wholly his, and the well when dug would be upon the lessee's land. In the instant case, the well would be upon the land of the lessor and a portion of the product would be his. We are therefore of the opinion that the trial court adopted the proper measure of damages in this case.

But it appears to us that the finding that the cost of drilling the well was $2,500 is not supported by the evidence. There is evidence that it would cost from $2,800 to $5,000 to drill and equip the well with casing, tubing, etc., and also, in response to the query of counsel for defendant in error, counsel for plaintiffs in error stated that he would agree that the cost of drilling and equipping such a well would be $2,000. The cost of the casing, tubing, and other equipment is not a proper element of damages. The equipment would be exclusively the property of the plaintiffs in error, which, by the express provisions of the lease, they would have been permitted to remove from the premises. The lessor was entitled to compensation only for the cost of drilling. and the only evidence in the record is that such cost would be $1,650. The amount awarded as damages, therefore, was excessive to the extent of $850.

If the defendant in error, plaintiff below, will within 15 days from this date, remit the sum of $850, the judgment for the remainder of $1,650 will be affirmed; otherwise, the cause will be reversed and remanded for new trial.

All the Justices concur.